# EXHIBIT C



Neutral Citation Number: [2008] EWCA Civ 1419

Case Nos: B3/2008/0596 & B3/2008/0596(A)

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM OXFORD COUNTY COURT**
**(MR RECORDER WEST-KNIGHTS QC)**
**6OX03505**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 18/12/2008

Before :

**LORD JUSTICE LAWS**
**LORD JUSTICE THOMAS**
and
**LORD JUSTICE WILSON**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **Beverley Anne Barclay** | Appellant |
| - and - | |
| **British Airways Plc** | Respondent |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Richard Menzies and Robin Gist** (instructed by Barrett & Co, Didcot) for the Appellant
**Mr Robert Lawson** (instructed by Gates and Partners, London EC3) for the Respondent

Hearing date : 8 October 2008
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 3 of 17

Judgment Approved by the court for handing down.                    Barclay v British Airways Plc

**Lord Justice Laws:**

*INTRODUCTION*

1. This is a claimant's appeal, brought with permission granted by the court below, against the decision of Mr Recorder West-Knights QC given in the Oxford County Court on 27 February 2008, by which he dismissed the appellant's claim for damages for personal injuries against British Airways.

2. The appellant's claim could only prevail if it fell within the terms of Article 17.1 of the Montreal Convention 1999, which provides:

   > "The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

   Article 17.1 has the force of law in England by virtue of Schedule 1B to the Carriage by Air Act 1961. It provides an exclusive remedy: *Sidhu v British Airways plc* [1997] AC 430, *El Al Airlines Ltd v Tseng* (1999) 525 US 155. Its predecessor was Article 17 of the Warsaw Convention 1929 as amended, whose terms were in material respects to the same effect as those of Article 17.1 of the Montreal Convention. I should note, however, that the Warsaw Convention was concluded in French. An English translation appeared in the Carriage by Air Act 1932, which gave the Convention the force of law in England. The result was that in relation to international carriage by air, the French text was to prevail in the case of difference. The Montreal Convention, however, was drafted in English.

3. The question in this case was, and is, whether the injuries sustained by the claimant were caused by an accident within the meaning of Article 17.1. The learned Recorder, after much citation of learning in this jurisdiction and the United States, held that they did not.

*THE FACTS*

4. A Statement of Agreed Facts was placed before the learned Recorder. It is in these terms:

   > "1   The defendant is a commercial air carrier.
   >
   > 2   On Sunday 17 October 2004 the claimant was the defendant's passenger for reward on international flight number BA288 from Phoenix Arizona in the United States to London Heathrow in the United Kingdom.
   >
   > 3   The claimant was shown down the port aisle of the aircraft to her seat number 26E, which was the second seat in a row of four seats (26D-G). The four seats were in the centre of the aircraft with an aisle either end. The claimant's seat was immediately to the port of the aircraft's midline.

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 4 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

    4    Immediately ahead of the said row of four seats there was another row of four seats. The first two seats of that row ahead (25D-E) were in a reclined position.

    5    In order to reach her seat the claimant passed sideways to her right between the reclined seats ahead and the first seat in her row (26D). In order to do so she had to lean slightly backwards.

    6    As she lowered herself into her seat, with her body weight towards the right, the claimant's right foot suddenly slipped on a strip embedded in the floor of the aircraft and went to the left.

    7    Upon slipping the claimant heard and felt her knee 'pop' and as it gave way it struck the armrest.

    8    The claimant sustained bodily injury.

    9    The layout of the passenger cabin, the seating space available to each passenger, the type of passenger seats and the strips installed on the aircraft covering the seating tracks were all in accordance with the defendant's usual standard for an aircraft of that type flying on the route in question and were not defective and in full working order.

    10    All of the aircraft's seating and all of its systems affecting the passenger cabin environment and floor were in their normal working order.

    11    The aircraft complied with, and the flight was carried out in accordance with, all applicable aviation regulations.

    12    The provisions of the Montreal Convention applied to the flight. This Convention provides the exclusive cause of action and sole remedy available against an air carrier in respect of loss, damage or delay suffered by passengers, or their baggage, in the course of, or arising out of, their international carriage by air."

5.    There was some little confusion about the facts at trial, or rather before trial, which was caused in part (as the Recorder put it at paragraph 78 of his judgment) "by the preparedness of BA to admit the claimant's case without having fully understood it". However the only gloss I need place on the agreed facts, for the sake of completeness, is that the strip referred to was a narrow plastic strip running under the seats and covering what was referred to as the seat fix tracking. This was an entirely standard fitment on a BA Boeing 747.

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 5 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

### *AIR FRANCE v SAKS (1985) 470 US 392*

6. The books contain a great deal of learning as to the interpretation of the term "accident" as it appeared in the predecessor provision, Article 17 of the Warsaw Convention. So far as is shown by counsel's researches, however, this is the first case in this court on Article 17.1 of the Montreal Convention. Both parties accept (correctly) that authorities on the earlier measure are just as valuable in relation to the current legislation.

7. By common consent the leading case on Article 17 of the Warsaw Convention, no less applicable to Article 17.1, is *Air France v Saks* (1985) 470 US 392 in the United States Supreme Court. The claimant, a passenger aboard an aircraft coming in to land, suffered pressure and pain in her left ear and was later diagnosed permanently deaf in that ear. The aircraft's pressurisation system was working normally. The airline moved for summary judgment against the claimant on the ground that she could not prove that her injury had been caused by an "accident" within Article 17 of the Warsaw Convention.

8. O'Connor J, delivering the opinion of the Supreme Court, analysed the text of the Convention (in both languages), the negotiating history of the Convention and the *travaux preparatories*, along with existing authority of courts in the United States and elsewhere. She identified two "clues", as she described them, to the meaning of the term "accident". The first was the contrast between the word "accident" in Article 17 and "occurrence" in Article 18 (dealing with liability for the destruction or loss of baggage) - "accident" thus means something different from "occurrence". (I should say that Article 18.1 of the Montreal Convention has the word "event" in place of "occurrence", but the force of the contrast, I think, remains the same). The second clue was that Article 17 refers to an accident which *caused* the passenger's injury, not an accident which *was* the passenger's injury. So the accident and the injury are clearly separated.

9. At length O'Connor J stated at p. 405:

> "We conclude that liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger. This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries."

She added at p. 406:

> "... [W]hen the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply."

Mr Menzies for the appellant submitted (skeleton argument paragraph 18) that "[t]his passage is not part of the *Saks* definition and should not be considered as cumulative with [the formulation at p. 405] – it merely demonstrates a situation where the

Case 7:09-cv-01803-RKE Document 22-3 Filed 07/28/10 Page 6 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

definition... is not fulfilled... It is not a 'gloss' or a 'second limb' to the test". I shall have to consider that.

## THE ISSUE

10. It is convenient at this stage to identify precisely the issue we have to decide. As I have indicated, the appellant must show that her injuries were caused by an accident within the meaning of Article 17.1. Thus the scope of the term "accident" is critical. It is clear (I shall cite relevant authority shortly) that proof of fault on the part of the carrier is not required. But "accident" cannot mean *any* occurrence on the aircraft which causes injury. So much at least is clear from *Saks*. To elucidate its scope in a thumbnail sketch, we may postulate three situations. (1) A member of the cabin staff loses his footing in the gangway and spills hot coffee, burning a passenger's hand. Plainly there is an accident; in the language of the *Saks* decision, "an unexpected or unusual event or happening that is external to the passenger". (2) A passenger suffers a heart attack unprompted by any event in the aircraft. As Mr Menzies accepted, plainly there is no accident; there is no event which might qualify as such. This situation is not far from the actual facts in *Chaudhari* (unreported: transcript 16 April 1997, Court of Appeal), to which I will refer. (3) The third situation is this present case. On the one hand, there is no event entirely unconnected with the passenger, such as the crew member losing his footing in situation (1). On the other, the injury is not caused by an autonomous collapse in the passenger's health with which the aircraft environment had nothing to do, as in situation (2). Mr Menzies' case is that there was an accident causative of his client's injury – her slipping on the plastic strip. Mr Lawson for the respondent submits by contrast that there was no accident – the slip was not an untoward event external to the passenger: the plastic strip was inert in its ordinary condition; nothing happened save for the appellant's coming into contact with it. The issue in the appeal can accordingly be stated in this way: where injury is caused by an event (here the slip) constituted by some contact or interaction between the passenger and the aeroplane in its normal state, is such an event an "accident" within Article 17.1?

11. In order to decide which submission is correct, it is necessary to look at further authority.

## THE BALANCE OF INTERESTS IN THE CONVENTION

12. First, we may obtain much assistance from learning which deals with the balance of interests inherent in the Warsaw (and now the Montreal) Convention. As a preliminary, I should say that in some of the cases emphasis has been laid (though perhaps little is needed) on the importance of a common construction of the Convention provisions in all the jurisdictions where it has been adopted: see, for example, *per* Lord Mackay of Clashfern in *Morris v KLM Royal Dutch Airlines* [2002] AC 628 at paragraph 7, which with respect I need not set out.

13. In the same case, *Morris*, Lord Steyn said this at paragraphs 14 – 16:

> "14. The effect of the Convention was described by Lord Hope of Craighead in *Sidhu v British Airways Plc* [1997] AC 430. Speaking on behalf of a unanimous House Lord Hope observed, at p 447B-E:

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 7 of 17

Judgment Approved by the court for handing down.                    Barclay v British Airways Plc

> 'On the one hand the carrier surrenders his freedom to exclude or to limit his liability. On the other hand the passenger or other party to the contract is restricted in the claims which he can bring in an action of damages by the conditions and limits set out in the Convention. The idea that an action of damages may be brought by a passenger against the carrier outside the Convention in the cases covered by article 17 - which is the issue in the present case - seems to be entirely contrary to the system which these two articles were designed to create. . . . In my opinion the answer to it is to be found not by an exact analysis of the particular words used but by a consideration of the whole purpose of the article. In its context the purpose seems to me to be to prescribe the circumstances - that is to say, the only circumstances - in which a carrier will be liable in damages to the passenger for claims arising out of his international carriage by air.'
>
> In *El Al Israel Airlines Ltd v Tseng* (1999) 525 US 155 the US Supreme Court followed *Sidhu* on this point. I respectfully adopt this analysis.
>
> 15. The Warsaw Convention is an exclusive code of limited liability of carriers to passengers. On the other hand, it enables passengers to recover damages even though, in the absence of the Convention and the Act, they might have no cause of action which would entitle them to succeed: *Swiss Bank Corporation v Brink's MAT Ltd* [1986] QB 853, 856G-H, per Bingham J (now Lord Bingham of Cornhill). It is therefore not necessarily right to approach the meaning of the phrase 'bodily injury' in article 17 of the Convention through the spectacles of full corrective justice.
>
> 16. It follows from the scheme of the Convention, and indeed from its very nature as an international trade law convention, that the basic concepts it employs to achieve its purpose are autonomous concepts. It is irrelevant what bodily injury means in other contexts in national legal systems. The correct inquiry is to determine the autonomous or independent meaning of 'bodily injury' in the Convention: *R v Secretary of State for the Home Department, Ex p Adan* [2001] 2 AC 477. And the premise is that something that does not qualify as a 'bodily injury' in the Convention sense does not meet the relevant threshold for recovery under it."

14. In the same case Lord Hope said this at paragraph 66:

> "From the point of view of the passenger or the owner of baggage or cargo, the imposition of liability without proof of fault on the carrier and the modification of provisions relieving him of liability or restricting the amount of his liability are very

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 8 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

significant advantages. From the point of view of the carrier too however there are significant advantages in the system laid down by the Convention. A principal consequence of that system is the exposure of the carrier to liabilities without the freedom to contract out of them. But it defines those situations in which compensation is to be available, and it sets out the limits of liability and the conditions under which claims to establish liability, if disputed, are to be made. A balance has been struck between these competing interests in the interests of certainty and uniformity."

15. Lord Hobhouse said this:

"146. ... The substantive provisions provide a division of risk between the carrier on the one hand and the goods or baggage owner or passenger on the other. In relation to carriage by sea, the salient features of this division of risk are provisions which impose evidential burdens on the carrier, give him limited exceptions which he can rely on and which give him either an absolute or qualified right to limit his liability. In the Warsaw Convention effectively the same scheme is followed for the carriage of passengers, their baggage and commercial cargo. In each case an agreed code divides the risk between the carrier and his customer. It provides uniformity and certainty; conflicts of laws problems are avoided as far as possible; the incidents of where any accident or litigation may occur are sought to be removed as far as possible; the negotiation and acceptance of the 'five freedoms' of international air transport were facilitated.

147. It follows from this that considerations of national or local law should not be allowed to intrude upon, let alone govern, any question of construction that may arise on the provisions for division of risk. As Lord Hope of Craighead said in *Sidhu*... at 453, 'The code is intended to be uniform and to be exclusive also of any resort to the rules of domestic law.' It is not right to attempt to construe the words of the Convention by reference to the rules of any domestic law, English, American, German or even French. We know that those rules were and are not all identical. The purpose of uniformity means that it is the duty of the national court to put to one side its views about its own law and other countries' laws. Quite apart from defeating uniformity, such a course can only lead to the complication of simple issues, the inadequately informed investigation of other legal systems and, most importantly, to uncertainty."

16. In *DVT and Air Travel Group Litigation* [2006] 1 AC 495 Lord Scott of Foscote described the canons of construction applicable to Article 17 of the earlier Convention in a passage which also reflects the balance of interests which the Convention strikes:

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 9 of 17

Judgment Approved by the court for handing down.                                           Barclay v British Airways Plc

> "11. Counsel for the parties were in broad agreement as to the principles of interpretation of article 17 that should be applied. The important principles for present purposes are that:
>
> (1) the starting point is to consider the natural meaning of the language of article 17 ...;
>
> (2) the Convention should be considered as a whole and given a purposive interpretation;
>
> (3) the language of the Convention should not be interpreted by reference to domestic law principles or domestic rules of interpretation; and
>
> (4) assistance can and should be sought from relevant decisions of the courts of other Convention countries, but the weight to be given to them will depend upon the standing of the court concerned and the quality of the analysis. I would add to these that the balance struck by the Convention between the interests of passengers and the interest of the airlines ought not to be distorted by a judicial approach to interpretation in a particular case designed to reflect the merits of that case. The point was well put by Scalia J in his dissenting opinion in *Husain v Olympic Airways* (2004) 124 S Ct 1221, 1234 (an opinion with which O'Connor J concurred):
>
>> 'A legal construction is not fallacious merely because it has harsh results. The Convention denies a remedy, even when outrageous conduct and grievous injury have occurred, unless there has been an "accident". Whatever that term means, it certainly does not equate to "outrageous conduct that causes grievous injury". It is a mistake to assume that the Convention must provide relief whenever traditional tort law would do so. To the contrary, a principal object of the Convention was to promote the growth of the fledgling airline industry by limiting the circumstances under which passengers could sue... Unless there has been an accident, there is no liability, whether the claim is trivial or cries out for redress.'
>
> 12. I think at this point a word of caution about the process of interpretation is in order. It is not the function of any court in any of the Convention countries to try to produce in language different from that used in the Convention a comprehensive formulation of the conditions which will lead to article 17 liability, or any of those conditions. The language of the Convention itself must always be the starting point. The function of the court is to apply that language to the facts of the case in issue. In order to do so and to explain its decision, and to provide a guide to other courts that may subsequently be faced with similar facts, the court may well need to try to

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 10 of 17

Judgment Approved by the court for handing down.                                  Barclay v British Airways Plc

> express in its own language the idea inherent in the language used in the Convention. So a judge faced with deciding whether particular facts do or do not constitute an article 17 accident will often describe in his or her own language the characteristics that an event or happening must have in order to qualify as an article 17 accident. But a judicial formulation of the characteristics of an article 17 accident should not, in my opinion, ever be treated as a substitute for the language used in the Convention. It should be treated for what it is, namely, an exposition of the reasons for the decision reached and a guide to the application of the Convention language to facts of a type similar to those of the case in question."

17. There is, I think, something of a contrast, if not a tension, in these passages which it is important to notice. On the one hand, for reasons in particular made clear by Lord Steyn in *Morris*, the concepts deployed in the Convention are autonomous: "[i]t is irrelevant what bodily injury means in other contexts in national legal systems". The same must apply to "accident". On the other hand, as Lord Scott said in *DVT*, "the starting point is to consider the natural meaning of the language of article 17". These propositions are not, of course, contradictory: the ordinary meaning of the language (in the Montreal Convention, English) is the starting-point, but given the autonomy of the Convention's terms and the need to give effect to the balance which it strikes, the definitive interpretation may lie elsewhere. However the fact that the ordinary meaning is no more than the starting-point, which on substantial grounds may need to be departed from, may counsel caution in evaluating Mr Menzies' argument as to the scope of "accident". Before I confront that I should turn to the principal English authorities on the meaning of the term "accident" in Article 17.1 (or, more strictly, its predecessor).

## "ACCIDENT" IN THE ENGLISH CASES: *SAKS* AFFIRMED

18. The Supreme Court's conclusion in *Saks* has been affirmed for the purposes of English law in the House of Lords in *Morris* and in *DVT*. *Morris* is a striking case because as a matter of ordinary language, as it seems to me, the event giving rise to the claimed injury can hardly be described as an accident at all; yet this court ([2002] QB 100) and the House of Lords held that it qualified as such within Article 17. The claimant, a teenage girl travelling alone, was indecently assaulted by a man in the next seat. One might have thought it a plain point in the carrier's favour that what happened, far from being an accident, was deliberate; and such a submission, though perhaps in less stark terms, seems to have been made to the Court of Appeal (see [2002] QB 100, 102H – 103D). At all events the focus of the reasoning in the judgment of the court given by Lord Phillips of Worth Matravers MR as he then was, addressing the meaning of "accident", is on a different point: whether the "accident" had to relate to the operation of the aircraft or be a characteristic of air travel. The court held that it did not (paragraphs 25 – 26), but was prepared to conclude on the facts that the assault was facilitated by a special feature of air travel, namely the cramped seating conditions which placed the young girl in close proximity to a strange man for an extended period of time (paragraphs 27 – 31).

19. The proposition that an assault can constitute an accident offers, I think, a strong example of the adoption of an autonomous meaning of a concept in the Convention,

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 11 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

so as to give concrete effect to the balance which the Convention strikes. In ruling as it did this court in *Morris* expressly (paragraph 24) applied the definition of "accident" given in *Saks*. Lord Phillips referred (paragraph 20) to the Supreme Court's "inclusion in the definition of 'accident' of torts committed by fellow passengers". The reference is to a passage immediately after the formulation of the definition at p.405. O'Connor J said:

> "[L]ower courts in this country have interpreted Article 17 broadly enough to encompass torts committed by terrorists or fellow passengers."

She proceeded to cite examples. They include (as the reference to "terrorists" anticipates) deliberate acts of violence such as terrorist attacks and hijacking. So it is well within the contemplation of the Supreme Court in *Saks* that facts such as those in *Morris* involve an "accident".

20. All that said, the claim in *Morris* was in fact dismissed by the Court of Appeal, but on grounds having nothing to do with the scope of the term "accident". It was submitted for the carrier that the depressive illness which the claimant suffered as a result of the indecent assault did not constitute "bodily injury", which under Article 17 had to be shown. This court accepted that submission. Whether it had been right to do so was the only live issue in the House of Lords (where the Court of Appeal's decision was upheld). In consequence, the House had little to say about the approach in *Saks* to the meaning of "accident". At paragraph 71 Lord Hope summarised the Supreme Court decision, referred to its approval in this court, and said:

> "I agree that it gives the word 'accident' a natural and sensible meaning in the context of article 17, and I too would adopt this approach".

21. By contrast in *DVT* the scope of the term "accident" was at the forefront of the argument in the House of Lords. The proceedings took the form of a group action alleging injury and in some cases death following the onset of deep vein thrombosis caused by air travel. This court ([2004] QB 234) held that on the facts there was no "accident" within the meaning of Article 17. Their Lordships' House agreed.

22. In this court in *DVT* it was common ground that the right point of departure for the application of the term "accident" was the judgment in *Saks*. Lord Phillips (paragraph 20) adhered to the court's view in *Morris* that *Saks* provided "a natural and sensible meaning in the context of article 17", and noted Lord Hope's agreement. At paragraph 21 of his judgment Lord Phillips added what with respect seems to me to be a helpful formulation:

> "[T]he concept of an accident taking place on board an aircraft which causes death, wounding or bodily injury is a simple one. The words naturally suggest an untoward event which impacts on the body in a manner which causes death, wounding or injury."

Lord Phillips went on to say this:

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 12 of 17

Judgment Approved by the court for handing down.                              Barclay v British Airways Plc

> "23. One can break down the definition of an accident into two elements. (1) There must be an event; (2) the event must be unusual, unexpected or untoward. I would endorse the approval by the United States Court of Appeals, Third Circuit in *Abramson v Japan Airlines Co Ltd* (1984) 739 F 2d 130, 132, of the following charge to a jury as to the correct legal standard for determining the occurrence of an accident under Article 17:
>
>> 'An accident is an event, a physical circumstance, which unexpectedly takes place not according to the usual course of things. If the event on board an airplane is an ordinary, expected, and usual occurrence, then it cannot be termed an accident. To constitute an accident, the occurrence on board the aircraft must be unusual or unexpected, an unusual or unexpected happening.'"

It is clear from the concurring judgments of Judge LJ (as he then was) and Kay LJ that they too regarded the reasoning in *Saks* as an uncontentious premise of the debate.

23. I turn to *DVT* in the House of Lords. I have already set out Lord Scott's treatment of the canons of construction applicable to Article 17. The following passages are important on the substantive meaning of "accident". First, Lord Scott:

> "6. The use in article 17 of the term 'accident' is to be contrasted with the choice of a different term in article 18. Article 18 imposes liability on carriers for damage to baggage or cargo...
>
> 7. The use of the term 'accident' in article 17 but the term 'occurrence' in article 18 must be significant. Both terms impart the idea that something or other has happened. But 'occurrence' is entirely general in its natural meaning. It permits no distinction to be drawn between different types of happening. 'Accident' on the other hand must have been intended to denote an occurrence of a particular quality, an occurrence having particular characteristics. In the many decided cases in which the issue was whether the occurrence in question constituted an 'accident' for article 17 purposes, the judges have had to ask themselves whether the occurrence possessed the necessary quality or characteristics to qualify as an 'accident'. It is evident that it was never, or should never have been, enough for there to have been an occurrence that caused the damage. For article 17 liability the occurrence had to have the characteristics of an 'accident'.

This passage may be said to emphasise O'Connor J's second "clue" to the meaning of the term "accident". Referring expressly to *Saks*, Lord Scott said this:

> "18. O'Connor J's opinion in *Saks* has been widely followed both in the United States and in the courts of other signatory

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 13 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

states. Both the standing of the court and the reasoning of the opinion justify that reliance. Moreover, as I have already observed, it is of importance that if possible a uniform interpretation of the Convention should be applied in all signatory states."

24. Lord Steyn, after citing *Saks*, said:

> "33. Let it be assumed that it can be shown that an event affecting a passenger adversely on an aircraft was unexpected and unusual. That is generally, however, not enough to make it an accident. It is an integral part of the test of what amounts to an accident that it must have a cause external to the passenger. In the case of DVT this factor is absent. The component parts of the event cannot therefore amount to an accident. It is closer to a passenger who suffers an asthmatic attack, congenital back pain, a hiatus hernia or simply from the wear and tear of extreme old age. Not surprisingly, such cases have in practice been treated as not amounting to accidents: see *Shawcross and Beaumont, Air Law*, VII, para 701 (Shawcross Issue 101). Consequentialist arguments militate in favour of treating essentially similar medical cases in the same legal way. After all, DVT is not immune from the general process of medical science."

25. Lord Mance's reasoning also proceeded from the starting-point of the *Saks* definition. He said:

> "66. ... [T]he Supreme Court's definition was suggested with the clear purpose of delineating boundaries to the concept of 'accident'. The claimant's submission in *Saks* had been that 'accident' embraced any 'hazard of air travel', and the Court of Appeals, whose judgment the Supreme Court was reversing, had used a definition derived from another convention (that on International Civil Aviation of December 7 1944), namely 'an occurrence associated with the operation of an aircraft which takes place between the time any person boards an aircraft with the intention of flight and all such persons have disembarked'. Such an approach would in one respect have introduced a limitation on the concept (to hazards or risk in some way associated with aviation travel) which is certainly not explicit if it exists in any degree in the Supreme Court's paraphrase... They would have opened up airlines to liability for bodily injury attributable to any such hazard or risk, whether or not involving anything untoward or unexpected or indeed internal in origin.
>
> ...
>
> 75. The present case involved carriage by air in an aircraft and in a manner, which were, in terms of industry standards and

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 14 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

> practice, at the relevant times, normal, usual and expected. Like the Master of the Rolls, I can see no basis on which the permanent features of the aircraft, or the subjecting of the passengers to carriage in aircraft with these features could amount to an 'accident' within article 17. That is not of course the same as saying that an unexpected event during the flight must always be instantaneous and immediately noticeable, rather than continuous and unrecognised. Ashley J in his partially dissenting judgment in the Court of Appeal of Victoria in *Povey* [2003] VSCA 227, at paras. 211-216, gave some examples of continuous situations (e.g. continuous malfunction of the pressurisation causing injury) where he thought that there would be an 'accident', and I am in sympathy with him on that point. But the situations he was envisaging were on any view unusual and contrary to expected airline standards and practice."

26. Lord Walker of Gestingthorpe expressed himself (paragraph 43) as being in full agreement with Lord Scott and Lord Steyn. He was at pains to emphasise that there will be cases at the borderline between accident and no accident. He cited *Olympic Airways v Husain* (2002) 316 F 3d 829 (in the United States Court of Appeals, Ninth Circuit), *Povey* [2005] HCA 33 (in the High Court of Australia), and "the curious incident of the dog in the night-time" (from the Sherlock Holmes story, *Silver Blaze*).

27. As it seems to me the reasoning of the Court of Appeal in *DVT*, and that of all the members of the House save for Baroness Hale to whose opinion I will turn directly, follow *Saks* in holding that an accident for the purpose of Article 17.1 is constituted by an unexpected event external to the passenger. Lady Hale's approach seems to me with great respect to be somewhat different. She said:

> "I share the view that this appeal should be dismissed and for essentially the same reasons. Once it is clear that the accident which causes the injury must be something other than the injury itself, it becomes equally clear that the suffering of an internal reaction to an ordinarily uncomfortable journey by air, during which nothing untoward other than that reaction took place, cannot fall within article 17 of the Warsaw Convention. But I would particularly like to associate myself with the observations of my noble and learned friend, Lord Scott of Foscote, on the dangers of interpreting the words of the decision of a court, which is interpreting the words of the Convention, as if the court's words were those of the Convention. If I fall over during a flight to New York, and break an arm, I suspect that we would all agree that my broken arm was caused by the accident of my fall; and we would do so irrespective of the reason for my fall; if it was my own silly fault, article 21 may relieve the airline of some or all the liability imposed by article 17, but that is another matter. In reaching those conclusions, we should not be agonising too much over whether my fall was an event 'external' to me. We

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 15 of 17

Judgment Approved by the court for handing down.                                    Barclay v British Airways Plc

> should simply be asking whether it was an 'accident' which led to my injury. My own synonym for 'accident' would be 'untoward event' but that is by the way."

28. This is problematic. Baroness Hale appears to sideline the requirement that the accident be "external" to the passenger. But that requirement is critical to the reasoning in *Saks* and the English authorities following *Saks*. And what the court makes of the requirement will determine the issue on which this appeal depends, which I formulated earlier (paragraph 10) and to which I return below.

29. Before confronting this issue directly, I should cite one other decision in this jurisdiction, to which I have already referred in passing. In *Chaudhari* the plaintiff was a disabled person who fell on attempting to leave his seat in the aircraft to go to the lavatory. His claim failed: there was no accident within Article 17. Leggatt LJ (with whom Thorpe and Mummery LJJ agreed) said at page 7:

> "In principle, 'accident' is not to be construed as including any injuries caused by the passenger's particular personal or peculiar reaction to the normal operation of the aircraft."

As I understand it *Chaudhari* has been taken to be part and parcel of the general line of authority following *Saks*. A number of other cases, from both sides of the Atlantic, were cited to the learned Recorder. With respect I need not set them out. Many do no more than exemplify the application of the *Saks* test.

## THE ISSUE RESOLVED

30. At paragraph 10 I formulated the issue in the appeal as follows. Where injury is caused by an event (here the slip) constituted by some contact or interaction between the passenger and the aeroplane in its normal state, is such an event an "accident" within Article 17.1? This formulation is intended to distinguish the case from two others – examples (1) and (2) in paragraph 10 – where the position seems to be clear. In (1) there is plainly an accident which occurs, so to speak, without any help from the passenger; it is entirely "external" to him or her. In (2), just as plainly, there is no accident at all. But (3) – this case – is less clear; and it might be said that the formulation in *Saks*, "an unexpected or unusual event or happening that is external to the passenger", does not conclude the question. As I have indicated Mr Menzies says that his client's slipping on the plastic strip was indeed such an event, and thus an accident. Mr Lawson submits that it was not; it was not an event which was "external" to the passenger.

31. Mr Menzies was at pains to underline the propositions (a) that in construing Article 17 the starting point is to consider the natural meaning of the language used, and (b) that "judicial formulation[s] of the characteristics of an article 17 accident should [never] be treated as a substitute for the language used in the Convention". In support of the latter submission he drew attention to this observation of Kay LJ in *DVT* in the Court of Appeal ([2004] QB 234):

> "86. Some of the decisions to which we have been referred suggest that courts have taken as their starting point other decisions on the application of the Article rather than, as I

Case 7:09-cv-01803-RKE   Document 22-3   Filed 07/28/10   Page 16 of 17

Judgment Approved by the court for handing down.                                             Barclay v British Airways Plc

> believe is inevitably correct, an initial consideration of the language of the Article itself. The result is a gradual journey so far away from the source that the origins can no longer be clearly seen."

Mr Menzies' argument thus places no little weight on the ordinary meaning of "accident". He submits that what caused his client's injuries was obviously an accident. He submits also that we should not be distracted from this plain reality by the refinements of judicial discussion in the authorities to which our attention was invited.

32. On the face of it these points possess considerable force. But Mr Menzies' reliance on the ordinary sense of the term "accident" is, as I have foreshadowed, to some extent undercut by the legal fact that "the basic concepts [the Convention] employs to achieve its purpose are autonomous concepts" (*per* Lord Steyn at paragraph 16 in *Morris*, cited above: see further Lord Hobhouse at paragraph 147, also cited). As for the submission that we should not be led away from the Convention text by the gloss of authority, I can see that if, for example, the argument were made to turn on what the Supreme Court meant by "external" in its judgment in *Saks*, it would be set on a wrong course; we should be interpreting an interpretation. But in deciding the issue before us we must obviously deploy binding authority "as a guide to the application of the Convention language to facts of a type similar to those of the case in question" (*per* Lord Scott at paragraph 12 in *DVT*, cited above).

33. On the substantive merits of his case Mr Menzies faces a further difficulty. He accepts, as he must, the correctness of the decision in *Chaudhari*, and thus the proposition that where injury is caused by an autonomous collapse in the passenger's health with which the aircraft environment had nothing to do, there is no accident: situation (2) in my set of three examples. But this tends to undermine his position on the facts of this case – situation (3). In the course of argument my Lord Thomas LJ suggested to Mr Menzies that a passenger might slip just as his client did, and be injured as a result; but the slip might be occasioned as readily by some pre-existing internal condition of the passenger as by anything to do with the aircraft. If it were so occasioned, Mr Menzies would not assert liability under Article 17.1 (if he did, any distinction of substance between situations (2) and (3) collapses). But there is the same *slip* whether it happens because of the passenger's health or the aircraft's condition. How then can the slip be the accident for the purposes of situation (3)? If not the slip, what else? Perhaps the accident is merely the lack of friction on the plastic strip; but that, surely, is hardly an event, or happening, at all.

34. These are formidable difficulties. However rather than allow their weight alone to conclude the case against the appellant, I think we should look at the problem from a more strategic point of view. I have cited authority concerning the balance struck by the Convention. If the appellant's case is good, then Article 17.1 would appear to impose liability for a very wide range of injuries suffered on board aircraft. Any slip or fall resulting merely from contact with an inert piece of equipment, installed and operating as intended, would constitute an accident. Indeed, it is hard to see how *any* injury, save only one caused by an autonomous collapse or deterioration in the passenger's state of health having nothing to do with conditions on the aircraft, would be excluded: there would presumably always be some event causing the injury, which could be categorised as an "accident" just as Mr Menzies has sought to categorise his

Case 7:09-cv-01803-RKE Document 22-3 Filed 07/28/10 Page 17 of 17

Judgment Approved by the court for handing down.                    Barclay v British Airways Plc

client's slip. But even if that goes too far, the multitude of instances where on Mr Menzies' case there would certainly be an "accident" discloses, in my judgment, a scenario which is far distant from the careful balance of interests struck by the Convention, as it has been described in particular by Lord Steyn, Lord Hope and Lord Hobhouse in *Morris*.

35. I conclude that Article 17.1 contemplates, by the term "accident", a distinct event, not being any part of the usual, normal and expected operation of the aircraft, which happens independently of anything done or omitted by the passenger. This gives the term a reasonable scope which sits easily in the balance the Convention strikes. It is, I conceive, in line with all the leading authorities from *Saks* onwards which, save only, with respect, for Lady Hale's opinion in *DVT*, uniformly emphasise the importance of the causative event's being "external" to the passenger. There are some particular formulations in the cases which (without picking over the texts to the last comma, a fruitless and inappropriate exercise) especially point, as it seems to me, towards this approach. I have already cited paragraph 21 of Lord Phillips' judgment in *DVT*, where he referred to "an untoward event which impacts on the body...". This suggests to my mind the happening of an event which is anterior to and separate from any involvement of the passenger. So also Lord Steyn's observation in *DVT* at paragraph 33 that "it is an integral part of the test of what amounts to an accident that it must have a cause external to the passenger". Assistance is also to be had from O'Connor J's observation at p. 406 of *Saks* itself:

> "... [W]hen the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply."

This was the passage which, it may be recalled, Mr Menzies submitted was "not part of the *Saks* definition". I do not agree. This statement is part and parcel of the Supreme Court's exegesis of the Convention.

36. In all these circumstances I cannot accept Mr Menzies' submissions. There was no accident here that was external to the appellant, no event which happened independently of anything done or omitted by her. All that happened was that the appellant's foot came into contact with the inert strip and she fell. It was an instance, to use Leggatt LJ's words in *Chaudhari*, of "the passenger's particular, personal or peculiar reaction to the normal operation of the aircraft".

37. I would dismiss the appeal.

**Lord Justice Thomas:**

38. I agree.

**Lord Justice Wilson:**

39. I also agree.